And we will hear first from Ms. Hurlbrink. You may proceed. Good morning, Your Honors. Katie Hurlbrink on behalf of Mr. Arredondo. In this escape case, the government alleged that Mr. Arredondo violated directions and limits by leaving a halfway house. The halfway house supervisor said she directed him to stay. He said she directed him to leave. And the prosecutor said, at a bill of particulars hearing, that that's why the factual dispute lies. The court thought that the jury sided with the defense on that factual dispute, doubting the supervisor's story. But at trial, the theory of escape changed. The court instructed the jury that Mr. Arredondo was guilty if he failed to return to the halfway house. And the prosecutor urged the jury to convict because Mr. Arredondo failed to call BOP. Those theories omitted any requirement to violate directions and limits. That constructively amended the indictment and induced Mr. Arredondo to prepare an insufficient defense. This court must reverse. The indictment, the language is, at least portions of it, is fairly broad. It says, you know, willfully failing to remain within the extended limits of confinement. Why doesn't that cover the continuing offense theory, that because he never returned back to the halfway house or reached out to authorities, that he didn't remain within the extended limits of confinement? So I think this is a critical point, Your Honor. The constructive amendment here did not arise as a matter of timing, but as a matter of conduct. We agree escape is a continuing offense. We agree the government was free to prove offense conduct starting on June 6th and ending at arrest. But the conduct the government proved had to be the same conduct laid out in the indictment, the failure to remain within the extended limits of confinement, and the failure to return as directed to Oceanview. So this conduct involving directions and limits. The problem with the court's instruction and the government's arguments in closing is that they invited the jury to convict on theories that had nothing to do with directions and limits. And I think we see this most clearly in the district court's answer to the jury's question. So that answer begins by saying escape as charged in the indictment is a continuing offense. No problem with that. But then it continues, which means that an escapee can be held liable for the knowing and willful failure to return to custody even after his initial departure. Total omission of limits, total omission of directions. It simply says if he willfully and knowingly failed to return after his initial departure, he is guilty. Was there any evidence presented with regard to events after the June 6th? So this is one day off the anniversary. Any efforts made by the government or the probation officer or the Halfway House people to contact him? To my knowledge, Your Honor, there was no such evidence in the record. Was there anything in the record about where he was during that time? Yes, Your Honor. As soon as he, you know, from our perspective, and I think the district court agreed with us, as soon as he was told to leave the Halfway House to go, he went, you know, from a place where he didn't have a bed, the Halfway House, to a place where he did have a bed, his mom's house. And if I were in his shoes, I would be presuming the marshals would be coming to pick me up there. It's not as though he went into the wind. And ultimately, he was, I guess, picked up coming off a hiking trail near his mom's house. But that was, what, late October? That's correct, Your Honor. Do we know anything? Is there anything in the record other than the inference, which is logical, that he went back to his mom's house, as to what he was doing to make himself unfindable or what he was doing to flee the jurisdiction? I don't believe there's any such evidence, Your Honor. I believe he, as far as the trial record goes, I believe he went to his mom's house and stayed there until his arrest. And so, of course, that is why this constructive amendment vitiated our defense. What's the specific language in Instruction 10 that you think crossed the line? Your Honor, is Instruction 10 the jury note? No, Instruction 10 is the instruction about what the meaning of the elements of the offense is. So, Your Honor, our challenge is not to Instruction 10. It's to the- Just to the response on the jury note. As well as some of the arguments that the government made in closing. And we know, from this court's precedence, that even if the court correctly lays out the elements of an offense, a constructive amendment can still arise. And we have a few different sites for that. One, there was a case called Hosent, where the court correctly instructed the jury about the offense, about the indictment, but then later instructed them that they could convict on unindicted conduct. And the court said, quote, the instructions as a whole were both conflicting and misleading. And then it continued, conviction should not rest on ambiguous and equivocal instructions to the jury on a basic issue. Another site I would have is from a case called Ward. In that case, the government expressly made the argument, the government can't- or there is no constructive amendment unless there's some instruction expressly telling the jury they can convict for uncharged conduct. And this court expressly rejected that argument. The court said, no, we look at the arguments that were presented and the instructions and the evidence, and we simply see whether there is a possibility that the jury could have convicted for an uncharged theory. So what- all right, so now I have the response in front of me that the court gave. What are the words that crossed the line? So it was- I would say it's words in combination with an omission. So, again, we don't have a problem with the continuing offense part. But then the court said, which means that an escapee can be held liable for the knowing and willful failure to return to custody even after the initial departure. And so that omits the key language from the indictment, failure to return as directed, and failure to remain within the extended limits of confinement, both of which were key to our defense. This would be read in conjunction with Instruction 10. That's correct, Your Honor. But, again, even when the other instructions, the original instructions, correctly instruct the jury, this court has still reversed when the answer to a jury question is wrong or misleading. And Castillo-Mendez is a great example of that, where the court correctly instructed on intent but then incorrectly answered a jury question in a misleading way. It talked about official restraint, same situation in Walker. And, in fact, in Walker, the court said- The question the jury asked was just temporal. Is the charge of escape being considered today solely for June 6th, or is it for every day after until the end of sentencing or apprehension? And then the answer is the offense of escape is charged in the indictment as a continuing offense, which means that an escapee can be held liable for the knowing and willful failure to return to custody even after his initial departure. That just sounds like it's telling the jury, because it's a continuing offense, it's not just June 6th, it's what happens the other days, where you're outside of custody, you don't go back. That doesn't seem to take away all the other elements that are in instruction, and would be read in conjunction with it. Well, a couple points on that, Your Honor. One, the court itself believed- So we asked the court, just stop at the end of continuing offense. Just put a period there. Don't put the rest of the instruction. Jurors wouldn't know, have a clue what that meant. Or, I mean, the court could have rephrased and said, you may convict for conduct after June 6th. But the court itself said that it believed the jury was really asking about conduct. So it says, I think my instruction goes to the call of the question. The call of the question is, look, are we limited just to the 6th, or does it go on after an organ? Which, of course, implies and implicates the failure to return on the 6th. And so he thinks that they are asking about whether they can convict for the failure to return. At sentencing, the court said something similar. The court said, you know, there was doubt about what happened with respect to that conflict, about permissions, limits. But, quote, when he stayed out after the dust-up, didn't call his lawyer, didn't call probation- this is the government's, called the authorities' theory- didn't report to the court, that's where the escape took place, and that's what the jury was told. I think the crux of your argument is that the government changes theories. But, you know, in the cases you cite, the construction, the constructive amendments of indictment, usually there was a factual predicate mentioned in indictment, and they didn't prove that if they proved something else, or that elements change. Here, that doesn't seem to be the case. And, you know, maybe it was, it took unfairly your client by surprise. They changed the theories, but I think under the indictment, I think both theories are present there. I don't know why they pursued the theory they did. It seemed like they had an easy layup and decided to shoot from half-court. You know, I'm not sure why, but, I mean, it seems within the language of the indictment and in response to the bill of particulars. Well, Your Honor, I don't believe that it has to involve a change of facts. In fact, we extensively briefed in our reply brief many examples of a change in legal theory, and not even The elements usually change here. It seems like elements didn't change. I mean, there were just different, you know, theories of the case. I don't think the elements changed that were listed in the indictment. I mean, I think it seems to cover the broad language of indictment about the limits of confinement. And if you don't return back and just stay at your mom's house, you're not within the limits of your confinement. I see Your Honor's question. So I think to understand why our defense went to that, it's important to remember that there is a mens rea here, where, you know, Mr. Ardano had to knowingly and willfully transgress limits and directions. And so even if it is the case that he did, in fact, transgress limits or directions, he at least had a good defense that when somebody in authority, someone with authority to give him directions, told him to leave, and he obeyed, that he at least did not knowingly and willfully transgress those directions and limits. And this court has made clear that that kind of change in legal theory, exactly how a crime took place, can give rise to a constructive amendment. So, for example, in Shipsey, a defendant was charged throughout the case with taking particular monies from a particular pension plan under a particular statute. That didn't change. But in the indictment, the government said that he committed that theft by fraudulent pretenses. Whereas at trial, the government was allowed to say that he took the money based on any theory of wrongful taking that was present under the statute, more similar to what happened here. And the court said that's a constructive amendment because Shipsey had notice only of the theory of theft by fraudulent pretenses, and the government was obligated to prove that theory of theft. All right. Thank you, counsel. I'm going to give you two minutes for public to go with questions. But we'll hear now from Mr. Howell. I plead the court, Zach Howell for the United States. I think my friend on the other side agrees at this point that the indictment and the trial deals with the same criminal episode, the same facts and evidence, and the same law in charge. Which were really narrowed down to whether the indictment had a narrower legal theory than what was produced at trial. Let's start with the legal theory produced at trial. Because everything I saw suggested, and I understand where the case got started, suggests that the government started with the theory that when he first went to the hospital, he did not have authorization. But it became clear very soon that that wasn't true. And his bunkmate calls and says, you're on escape. They're packing up your stuff. So he comes back. And then the critical element seems to be whether he's turned away or allowed to come back in. And the government starts with the theory he's allowed to come back in. And I think Judge Barnes makes it pretty clear now that a jury's not going to rule that way if there wasn't beyond June 6th. They weren't believing the supervisor's testimony. And Judge Barnes was very careful to say, it's been a long time. She may have forgotten and so forth. He wasn't accusing her of fabricating. But he made it pretty clear the jury wasn't going to believe that. And I look back at the discussion in the context of the bill of particulars, and it seems to me at that point the government makes it very clear. Its argument is that they never told him he couldn't come in. And when I'm reading here, it is the United States contention, and we intend to prove a trial. He was absolutely never told you cannot come back in. And that's not what Judge Barnes at least thinks the evidence showed. And so the jury note suggests only if we consider what happens after June 6th can we convict. The judge says you can consider what happens later. It's a continuum offense, which as a matter of law is true, but not the theory that had been presented by the government. And so one of the reasons I asked the questions I did earlier of your colleague, was there anything in the record about what efforts were made by the government to contact him after June 6th? And her answer was no. Do you have a different answer to that? No, I think that's correct. Okay. And I asked, is there any evidence as to where he was? And I had already guessed, and it appears he was at his mother's house. And it was like what, four months later, finally he gets picked up. Had there been any effort by the government whatsoever to contact him to bring him back in? I don't know if there was an effort to contact him during that four-month period. So there's nothing in the record that suggests that. And so exactly what is he supposed to do if the jury had concluded, as Judge Burns thinks that they would have, that he was turned away? And Judge Burns' comments of the little bit of video we have shows him on the other side of the metal detector not being admitted. I'm baffled as to what he's supposed to do. And for that matter, I'm baffled as to how it fits within the indictment language. What's the boundary that he's not supposed to cross if they don't let him in? Where is he supposed to go? And at what direction is he refusing to report? Sure, Your Honor. So let me try to address all of that. So I am baffled by this case, and so I would appreciate your guidance. Fair enough. So I absolutely agree that that was a theory that the government pursued. I think that's the half-court shot that Judge Lee referred to. What I disagree with is that the layup was never pursued or wasn't pursued until trial. I think it was pursued from the outset of the case, all the way through pretrial proceedings and all the way through trial. And I'm happy to give examples of that. Now, before I get there, I want to answer your specific question, which was what is he supposed to do. I think the Bailey case addresses this expressly because there you had. . . I'm not so sure because Bailey is a situation where people say they had to escape out of necessity. And what the Supreme Court says in Bailey is, well, once the necessity is over, if you've left by your claim of duress, once the duress is over, you don't have a reason to be out anymore. He didn't leave that way. He was given permission to leave, and yet he was told he's on escape. He's told to come back. He comes back, and then he's turned away. That doesn't sound to me like Bailey at all. I understand that Bailey says as a matter of law, escape is a continuing defense, and it surely had been charged by the government in the indictment, in the bill of particulars. He failed to respond to our efforts to bring him back. But there's none of that because there's no record that there was any effort to bring him back. He was allowed to stay at his mom's house for four months. So where is the theory alleged before that contradicts that? So, again, I want to try to get to all of that. I think the analogy to Bailey fits in the sense that you had individuals who were gone between one to three months, and they said, look, the guards were threatening us with death. They were allowing fires to be set off at the prison that were endangering our safety. There was no evidence that those conditions had gone away, that the guards had stopped threatening them or the fires were going to stop letting fires be set. My understanding of the case was that the court simply said, look, for that one to three months, there was no evidence that you made any attempt to turn yourself into authorities. They had some testimony about trying to contact the FBI that was disputed by the government. But that was the point is that there was no effort to try and turn yourself into authorities, not even necessarily the same facility that was housing them, but authorities who wouldn't threaten you or set fires to your facility. But at the end of the day, I think all of that would just go to a factual argument about whether his conduct was willful in continuing to remain away for four months or not, or potentially whether there was some duress or necessity that remained in place. But none of that has anything to do with the allegations in the indictment. The indictment says very broadly that he failed to remain within the extended limits of his confinement. What were the limits? So the limits of the confinement would certainly include the halfway house itself. But he was turned away from the halfway house. So what is the confinement? I mean, I'm trying to be practical here, and particularly with regard to willful. If he's told he can't come in, and that appears to be what Judge Burns thinks the jury was going to find if it had to answer that question. And that was the question that the government said is the centerpiece of the case, what it's really about. So if the jury answers that question, he was turned away, where is he supposed to go? So, Your Honor, again, I think that's a factual argument. But if the question is… It's a factual argument, but there's no evidence whatsoever that suggests there was someplace else he could go to be within the limits of the confinement if, in fact, he had been turned away. So I'll address that head on. But I just want to note, if the question is did he remain within the extended limits of his confinement, then on June 6th, 7th, 8th, and for four months… that he was turned away from the halfway house, where else did he have to go that was within the extended limits of the confinement? So I think that goes to willfulness and not the extended limits. The extended limits would be his halfway house, and then, you know, any other permission he has to be… So he's supposed to sleep outside the door if he's been told he can't come in there? Not at all, Your Honor. Again, this goes to… I'm trying to be practical. Where is he supposed to go? I'm waiting for an answer to that question, and you've told me lots of things that you're going to tell me, but I still haven't gotten an answer to that question. Where is he supposed to go? And I apologize. There's a lot packed into the question. I understand that. But the first question is a simple one. Where is he supposed to go that would qualify as within the extended limits of confinement? So he would walk into any police station. He would pick up the phone and call any police officer of any authority. Is there anything that I've heard about obligations where we're pouring into probation? Or to probation? No. Or anything? So, yes, at page 110 and 127 and 128 of the record, as well as some of his own testimony, he has been told that he is in custody of the BOP at Oceanside, and there's an intake process and orientation manual, a meeting with his case manager where he's given contact information. And so he has contact information for people to contact, and he's told that any time he's away he needs to be in contact with the facility. And I think that's the point, is this is a factual defense that goes to willfulness or duress or necessity. It has nothing to do with whether he is within the extended limits of his confinement. If he's not at Oceanview on June 6th or July 6th, he is failing to remain within the extended limits of his confinement, as alleged in the indictment. He can contest all of that factually, but the theory is right there in the plain face of the indictment. See, I have 30 seconds. I just want to note that there's some implication that this was a big surprise to defense counsel. I think the indictment shows otherwise, but I think the bill in particular and a number of pretrial proceedings show otherwise. The bill in particular says expressly that he failed to return. That's part of the allegations that the government was going off of. And then in the motions in limine, the government two months before trial, a little less than two months before trial, described as part of the instant offense him being arrested four months later. That's page five of the supplemental excerpts of record. At page 20 of the supplemental excerpts of record, in the same motion response where the government provides the voluntary bill of particulars, it says expressly the United States can proceed on a theory that defendant violated 751A by failing to report back to the facility in which he was confined to. And that was one of the theories articulated that he was supposed to come back, and he didn't come back on a timely basis. Only it turns out he did come back on a timely basis. And, again, if we believe Judge Byrne's assessment, he was turned away. And, again, that's all a factual argument. Would I say that that articulation in the bill of particulars covers his failure to return on June 7th, 8th, 9th, 10th for the next four months, particularly when the government makes no effort to get him? So, Your Honor, how willful can that be? I see I'm out of time. Let me give a brief response, and maybe just to try and frame it a different way. We know from Bailey that escape is a continuing offense and that you don't need to allege the continuing nature of the offense expressly in the indictment. So the only question here is, is there something so different about what this indictment did that it takes you out of Bailey land? And I think the answer is no, given the very broad wording of the indictment. I haven't even got to the second theory that was in the indictment, but we allege two theories in the conjunctive. We can prove them in the disjunctive. One was failing to remain within the extended limits of confinement. The other was failing to report as directed to the federally contracted facility. And when was he directed? So, Your Honor, if there's no evidence that he was contacted after June 6th, and on June 6th the evidence suggests he reported and was turned away, when was he directed to report that he failed to respond to? Sure. So let me give a broad response and then a narrow factual response. I think the broad response is that anyone who is sentenced to a term of custody is by necessity directed to report to custody for that term. I don't think anyone would say that a prisoner believes they can walk out of custody because they haven't been directed in some formal sense to be in custody. The sentence itself does that. But if you want a factual answer for this record, and again I think you can look at page 110, 127, and 128 of the record, that's where the facility monitor and the residential reentry manager talk about the fact that Arredondo has been transferred from POP custody to the residential reentry center and that he has a handbook, an intake process, an orientation where he's told that he needs to get permission to be anywhere other than Ocean View. Okay. All right. Thank you, Your Honor. One question. It's an address to the merits, but there's something in the record that I found possibly troubling. It seems like I know it wasn't you, but a trial asked for two points in the sentencing for obstruction. What is the basis for that? So I believe it probably was based on what we perceive to be the false testimony in a trial. That just seems. If anything, testimony trials showed your key witness was the one who wasn't telling the truth. And if she claimed he called him multiple times on his cell phone, the cell phone records belie that. And she claimed he went to the metal detector. The video shows he didn't. So, if anything, it seems like the government's witness wasn't telling the truth. And it seems you're just, like, piling on. I mean, Judge Burns didn't accept that. But, I mean, this isn't like a video game where you're trying to get maximum score. I mean, it just seemed completely gratuitous. It was a little bit troubling to me. Sure. That's fair enough, Your Honor. And, again, I don't have insights into the exact ins and outs of what made the prosecutor seek it. I mean, what I can say, and I don't want to give too hard a defense of it, given that you've described it as a half-court shot, but it did strike us as strange that, you know, when both parties agree, you know, Arradondo himself testified that he was told to come back to the facility from the hospital. And that's the same thing that the monitor said, was, I told him to come back to the facility from the hospital. It seems strange that she would have told him to come back to the hospital, only to come back from the hospital, only to tell him, okay, now leave again. Especially his testimony. He was told to come back by his bunkmate. There's really, I couldn't find any evidence. She says she made several phone calls. There is no record of any of those phone calls. All the calls seem to have come from him. And so it's true. I understand perfectly why the prosecution was initiated, but it turns out it's the government's witness that falls short. And I've got to say, I'm kind of appalled that we're still litigating this. I thought the piling on was unusually remarkable. But I don't rule out the possibility that your office might take another look and ask, is this worth pursuing? I've got real problems with the pursuit of the case, even as I understand the legal theories about escape being a continuing offense, and even as I understand reviewing the evidence, most favorable and so forth. But since the guy was turned away, went to his mom's house and sat there for four months, doesn't sound like escape to me. I understand all of that. I'm certainly happy to chat with the prosecutor on the case. Again, I do agree that this is, as Judge Lee said, there was a half-court shot. My only contention here is that the layup was included both at trial and in the indictment. All right. Thank you, Counselor. We'll hear now a rebuttal from Ms. Farrelly. Your Honors, I'd like to start today with the Bill of Particulars that counsel discussed. I think an important part of the Bill of Particulars is that it confined the allegations to defendant, quote, leaving Ocean View without permission and then not returning. And so I think the government's answers to your question, Judge Clifton, about him not calling the authorities, not checking into probation, that's not leaving Ocean View. That's not failing to return to Ocean View. So all of those theories are outside of the exact Bill of Particulars that the government gave us. And the government may have, you know, cited some vague statements in some of its motions that it thinks gave us notice, but we were entitled to rely on the indictment and the Bill of Particulars and the formal statements about what the government would be proving at trial. And we accepted what was called the layup. Would your client have had a defense? Your Honor, I don't know. So if I understand the layup correctly, the idea is that Mr. Ardando would be guilty just simply if he failed to return to Ocean View, period. Failed to call back in, contact. He had phone numbers. He had a probation officer, I guess. He had his own attorney. It seems to be the case, and we don't have much evidence of this, but it seems to be pretty well conceded at this point. He did not take affirmative action to go back the next day or the week next week or the next month or to contact somebody. And so if that had been the allegation laid out in the Bill of Particulars, I'm not sure you would have had a defense. Well, Your Honor, I do think we would still have a mens rea defense. You'd have a mens rea, okay. Because actually, Bailey says, talks about the potential for this defense. It says, quote, We need not decide whether a person could be convicted on evidence of recklessness or negligence with respect to the limits of his freedom. A court may someday confront a case where an escapee did not know, but should have known, that he was exceeding the bounds of his confinement and that he was leaving without permission. So your argument really is that because you didn't understand the government's case to include what we've hopefully called the layup, you didn't put up the defense that you might have had to offer to the layup, and there is, like, nothing in the record about what happened between June 6 and October, whatever the date was. I think our claim goes slightly beyond that, which is that the indictment did not include the layup, or rather the government could have argued the layup to the extent that the jury was instructed that they had to find some violation of limits or directions, but that was entirely omitted from the court's instructions, and it was not made clear in the government's closing. So this is a different problem I'm having. I mean, ultimately, this isn't here as a Rule 29 or whether there's sufficient evidence. The question is whether or not the jury got the proper understanding of the elements of the offense and whether or not the way the case was shaped for the jury was material variance from the indictment. But I just don't see how the supplemental instruction, which addresses just the temporal element, undoes what you concede is a valid Instruction 10 setting forth the elements of the offense. I don't see how it undoes it. So... Well, Your Honor, I wouldn't say it undoes it, but it does conflict with it because it says... What does it change? What does it take back from Instruction 10? The as-directed language and the limits language. So it says that Mr. Arradondo is liable for the knowing and willful failure to return to custody even after his initial departure. I mean, did Mr. Arradondo fail to return to custody? Absolutely. But our argument was that he failed to return to custody. He did not fail to return to custody, at least not knowingly and willfully, in violation of corrections and limits. But that would be read together with the willful failure of a prisoner to remain within the extended limits of his confinement or to return within the extended limits of his confinement or to return within the time prescribed by the facility is deemed to be an escape from the custody of the Attorney General. So, you know, yes, it uses the phrase to return, but that would be understood together with Instruction 10 as having all those other details that are not located, again, in the answer to the jury note that was focused on time. Well, Your Honor, that is not how the court understood the jury to have taken that instruction because, again, the court said that it was when he stayed out after the desktop, when he didn't call his lawyer, didn't call probation, that's where the escape took place, and that's what the jury was told. And I think Your Honor's point about reading the instructions as a whole, this court has expressly said it is no answer to say that the supplemental instruction, the answer to a jury question, was correct so far as it went or that it was to be read in the light of the original instructions and that these fairly presented the issues. When the court misadvises a jury in a direct response to a question about what behavior they can convict a person of, that's a constructive amendment or, at the very least, it's an erroneous answer to a jury question. Okay. All right. Thank you, Counsel. Thank you. The case just argued will be submitted.
judges: CLIFTON, COLLINS, LEE